UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| DANNY JOHNSON, TDOC # 334241, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | NO. 1:10-cv-318 |
| | ) | *Mattice/Carter* |
| DAVID OSBORNE, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>MEMORANDUM OPINION</u>

This is a *pro se* petition for a federal writ of habeas corpus, 28 U.S.C.§ 2254, filed by Danny Johnson ("Johnson" or "Petitioner"), an inmate in the Morgan County Correctional Facility in Wartburg, Tennessee, [Doc. 1]. Petitioner challenges the constitutionality of his confinement pursuant to a 2001 conviction in the Criminal Court for Sequatchie County, Tennessee where, after a hung jury and a mistrial was declared, a jury at the second trial returned a guilty verdict on two counts of rape of a child and one count of aggravated sexual battery. Thereafter, Johnson received two twenty-one-year terms for the first two offenses and eight years for the third—all set concurrently and to be served at 100%. Warden David Osborne has filed an answer, which is supported by copies of the state court record, [Docs. 10-11, Addenda 1-4]. Thus, the case is ripe for disposition.

## I. <u>Procedural History</u>

Johnson's convictions were affirmed on direct appeal by the Tennessee Court of Criminal Appeals ("TCCA") and the Tennessee Supreme Court declined any further review. *State v. Johnson*, No. M2002-02139-CCA-R3-CD, 2003 WL 22999449 (Tenn. Crim. App.

Dec. 23, 2003), *perm. app. den.*, (Tenn. 2004). After Petitioner's subsequent application for post-conviction relief was denied by the state courts, *Johnson v. State*, No. M2008-02115-CCA-R3-PC, 2009 WL 4723382 (Tenn. Crim. App. Dec. 9, 2009), *perm. app. den.*, (Tenn. 2010), he timely filed this instant habeas corpus petition.

## II. Factual Background

The factual recitation of the evidence offered against petitioner is from the Tennessee Court of Criminal Appeal's opinion on direct review of his convictions.

> On May 24, 1999, the Sequatchie County Grand Jury returned a six-count indictment charging the [petitioner] with three counts of rape of a child and three counts of aggravated sexual battery. The [petitioner] was initially tried by a jury in September 2000; however, the jury was unable to reach a verdict and the trial court declared a mistrial. Prior to declaring a mistrial, the trial court dismissed one count of rape of a child and two counts of aggravated sexual battery.
>
> The [petitioner] was retried on the remaining counts on April 16 and April 17, 2001. At trial, Sergeant David Robertson of the Dunlap Police Department testified that on December 13, 1998, he was called to the victim's home to interview the victim and the victim's mother about a possible child molestation. Sergeant Robertson related that during the interview the victim identified the perpetrator of the offense. After further questioning the victim, Sergeant Robertson directed the victim's mother to take him to T.C. Thompson Children's Hospital. Sergeant Robertson then contacted the Department of Children's Services (DCS) regarding the offense. At trial, Sergeant Robertson stated that he knew the [petitioner], but had "never had any dealings with him." He testified that the [petitioner] lived across the street from the victim's house.
>
> On cross-examination, Sergeant Robertson conceded that he did not collect any physical evidence from the [petitioner]'s home. However, Sergeant Robertson testified that he was merely the "responding officer." He explained that "if there's a crime ... which would involve an investigation or other departments, then we just notify the investigator and then him or the chief would take it from there."

Vanessa Raulston, a Child Protective Services Case Manager with the Sequatchie County DCS, testified at trial that in December 1998 she was notified by local law enforcement of the possible sexual abuse of the victim. Raulston subsequently spoke with the victim's mother and Dr. Michael Tiger, who had examined the victim at T.C. Thompson Children's Hospital. Thereafter, Raulston referred the victim to the Children's Advocacy Center (CAC). At trial, Raulston explained that CAC is "a specialized doctor office set up in Chattanooga ... and [the surrounding] counties ... take children there for exams and they specialized in sex abuse exams."

Thomas Zervos, the victim's father, testified that the victim, his youngest son, was born in Ohio on June 6, 1989, and, at the time of trial, was almost twelve years old. Zervos related that in May 1998, the family moved to Dunlap, Tennessee. Upon moving into their new house, the family met the [petitioner], who came over to introduce himself and help with the move. Zervos stated that the [petitioner] lived across the street and quickly became a friend of the family. Zervos testified that the [petitioner]'s mother had agreed to sell the Zervos family property on which to build a house.

Zervos testified that his family and the [petitioner] "ate together quite often," and the [petitioner] went on vacation to Ohio with the Zervos family. Zervos related that he allowed the victim to go to the [petitioner]'s house alone. He explained that the [petitioner] had purchased a video game system at a flea market, and the victim enjoyed going to the [petitioner]'s house to play the games. The victim also liked to go to the [petitioner]'s house to watch televised wrestling.

On cross-examination, Zervos stated that after making the instant allegations, the victim did not return to the [petitioner]'s house. Zervos conceded that he was upset about the sexual abuse of his son and that he called his friend, Robert Vandergriff, when the victim was taken to T.C. Thompson Children's Hospital. However, Zervos denied telling Vandergriff that "the same thing happened in Ohio and now it's happening down here." Zervos acknowledged that the victim was a hyperactive child. Additionally, he acknowledged that the agreement to purchase property from the [petitioner]'s mother "fell through," but he maintained that despite having made some improvements to the property, he was not upset about it. Zervos testified that his family had subsequently moved from Dunlap to Ohio, and then to Chattanooga, Tennessee.

At trial, the victim testified that he was eleven years old and in the sixth grade. He stated that he was in third grade when he and his family moved to Dunlap. The [petitioner] lived alone across the street from the victim's house. He explained that the [petitioner] had purchased a video game

3

system and that he enjoyed going to the [petitioner]'s house to play the games. The victim testified that he also liked to watch wrestling on the [petitioner]'s television. The victim related that when he went to the [petitioner]'s house, he would go either alone or with his father.

According to the victim, the first incident of inappropriate conduct occurred in November 1998. The victim testified that he and the [petitioner] were in the [petitioner]'s living room when the [petitioner] began touching the victim's "private parts" through his clothes. Regarding the second incident occurring on December 1, the victim stated, "[The petitioner] took me into the bedroom and he told me to bend over and pull my pants down and he stuck his front private in my rear private." The victim recalled that "it hurt" and that the [petitioner] used "a white bottle of lotion." The [petitioner] told the victim "not to tell anybody or he'[d] get in big trouble." The final incident occurred on December 11. The victim testified, "[The petitioner] took me into the bedroom and he told me to bend over and pull my pants down and he took and put his front private into my rear private again." Once again, the [petitioner] told the victim not to tell anyone.

Approximately two days later, the victim told his mother about the abuse. The victim's mother called the police and, shortly thereafter, Sergeant Robertson arrived. The victim related that after being questioned by Sergeant Robertson, he was taken to the hospital where Dr. Tiger examined his "privates." The victim testified that he was subsequently examined by Nurse Spada. The victim testified that he informed both Sergeant Robertson and DCS case worker Vanessa Raulston that the [petitioner] had committed these offenses. The victim identified the [petitioner] at trial.

On cross-examination, the victim stated that after December 11, 1998, he had no contact with the [petitioner]. The victim acknowledged that prior to these offenses he had been going to the Joseph Johnson Mental Health Center. The victim stated that following the offenses, he and his family had moved to Ohio, then to Chattanooga.

At trial, Kathy Spada, a nurse at T.C. Thompson Children's Hospital, testified that she also worked at CAC, "an outreach program ... trying to serve the kids who allege sexual abuse." She stated that law enforcement and DCS case workers refer child victims of sexual abuse to CAC. Spada testified that she had treated over three hundred (300) children at CAC, including the victim in the instant case.

Spada related that on December 22, 1998, the victim was brought to CAC by his mother. Spada testified that initially she conducted a regular physical exam to make the victim feel more comfortable. Next, she conducted a genital exam during which she observed no irregularities. Finally, Spada

conducted an exam of the victim's anus. According to Spada, the victim "had given a history of having anal sex and ... I noticed that there was flattening of the folds" and a loss of muscle tone. Spada testified that her observations were consistent with the victim's allegations. She further explained that in order to get flattening of the folds of this nature, "outside force" had to have been applied "at least a couple of times." However, Spada conceded that she was unable to identify the specific object that had been inserted into the victim's anus to create the flattening of the folds.

On cross-examination, Spada was unable to recall how long her examination of the victim had lasted. She further acknowledged that defecation could cause stretching of the rectal area. However, she maintained that the "need to go to the bathroom" would not cause flattening of the anal folds.

Dr. Michael Tiger, a pediatric resident, was working at T.C. Thompson Children's Hospital when the victim was brought into the emergency room. At trial, Dr. Tiger testified that the victim presented with a history of being a victim of both oral and anal sex. Dr. Tiger related that the victim was embarrassed and very tense when discussing what had happened to him. Thereafter, Dr. Tiger conducted a normal physical examination of the victim, followed by an examination of the victim's genitalia and anus. Dr. Tiger stated that although he did not observe flattening of the folds, he did discover two bruises around the victim's anus. Dr. Tiger explained, "Usually the bruise occurs from some sort of outside force." Dr. Tiger further related that he found no tearing or fissure of the anus, but he explained that this was not uncommon because the anus easily expands. Dr. Tiger testified that the bruising was consistent with penetration; however, he was unable to identify what object had penetrated the victim's anus. Upon discovering the bruises, Dr. Tiger contacted the local DCS and asked them to contact CAC in Chattanooga.

On cross-examination, Dr. Tiger acknowledged that he did not note in the victim's medical chart that the victim was tense, writing instead that the victim was "active, alert, and smiling ... as well as embarrassed." Dr. Tiger further conceded that the bruising of the anus was opposite the alleged flattening of the anal folds. Dr. Tiger admitted that it was possible that the flattening of the folds was not present when he examined the victim. Dr. Tiger testified that during his examination on December 13, 1998, the victim reported that the last incident of abuse occurred "more than a week before." Moreover, Dr. Tiger related that he found nothing to indicate that there had been any sexual abuse "two days prior to [the] exam."

As its first witness, the defense recalled Vanessa Raulston, the DCS case manager who had interviewed the victim on three separate occasions regarding the alleged incidents of sexual abuse. Raulston related that at the

first interview on December 15, 1998, the victim reported that these incidents occurred in the living room. She further stated that at the December 15 interview, the victim did not allege that he was sexually abused on December 11, 1998, and told her nothing about anal penetration or the use of lotion. However, Raulston testified that when questioned about which part of his body the [petitioner] touched, the victim circled the penis on a diagram of a young male child. Raulston stated that at the same interview, the victim told her that he saw the [petitioner]'s "privates" in November when the [petitioner] fell upon getting out of the shower. The victim also reported that he saw the [petitioner]'s "privates" on December 1, explaining

> [The [petitioner]] wanted me to touch him but I didn't. He was standing up and had blue jeans pulled down halfway and had on a John Deere Hat, white shirt and tenny [sic] shoes. I was lying on the floor [and] I turned around and said, "Yuk." Because he said, "Look." ... [T]hen he pulled his pants up and then he drank some tea and smoked a cigarette. Dad called and I went home.

On cross-examination by the State, Raulston acknowledged that the victim told her that the [petitioner] "had touched his private with his hand ... and wanted to touch his private with his mouth[.]" Raulston explained that at a subsequent interview on December 29, the victim described the incidents of abuse occurring on December 1 and December 11, 1998, noting both the use of lotion and the anal penetration. Raulston maintained that there were no inconsistencies in the victim's statements and that at each interview the victim identified the [petitioner] as the perpetrator of the offense.

Testifying on his own behalf at trial, the [petitioner] related that he met the Zervos family when they moved across the street from his house. The [petitioner] testified that he and the victim's father became close friends and because of that relationship he was "friendly" with the victim. The [petitioner] stated that the Zervoses had agreed to purchase property owned by the [petitioner]'s mother. The [petitioner] explained that the Zervoses planned to build a house on the property and began making the necessary improvements to the land. However, in early November or December 1998, the [petitioner] informed the Zervoses that if they were unable to purchase the property by the end of the year, his mother wanted to "put the land up for real estate." The [petitioner] testified that Tom Zervos "seemed mad," and thereafter their relationship changed. The [petitioner] stated that he believed the Zervoses made the instant allegations because they were angry.

The [petitioner] testified that prior to the instant allegations, the victim and his father would come to the [petitioner]'s house. He insisted that the victim never came to his house alone, except on one occasion when the

[petitioner]'s daughter was present. The [petitioner] further related that the victim had a bad temper. On cross-examination, the [petitioner] explained that, because of the victim's "unruly" behavior, he did not allow the victim to come to his house without his parents. The [petitioner] acknowledged that when the victim and his father came to the [petitioner]'s house, the victim liked to play with the Nintendo Game System. The [petitioner] also conceded that he was not certain that the Zervoses made the instant allegations because they were upset about being unable to purchase the property.

Betty Sturgeon and David Sanders also testified at trial on behalf of the [petitioner]. They testified that in December 1998 they lived near the [petitioner] and the Zervoses. Sturgeon related that the victim often played with her eleven-year-old son. Sturgeon claimed that the victim was a "liar." Sanders testified that Tom Zervos was upset when the "real estate deal" between the [petitioner]'s mother and the Zervoses "fell through." Both Sturgeon and Sanders insisted that they never saw the [petitioner] alone with the victim.

Robert Vandergriff testified that he was acquainted with Tom Zervos. He related that in December 1998, he received a telephone call from Zervos. He testified that Zervos sounded concerned, explaining, "He said the same thing happened [in Ohio] as what happened here...." On cross-examination, Vandergriff acknowledged that he met Zervos through the [petitioner]. He related that he had known the [petitioner] for five years. Vandergriff conceded that during their telephone conversation, Zervos never mentioned the word "rape."

In rebuttal, the State called Norman L. Johnson to testify. Johnson testified that in the fall of 1998 he was riding on his "four-wheeler" when he observed the Zervoses looking at property owned by the [petitioner] and his mother. Johnson related that the Zervoses planned to build a house on this property. According to Johnson, the [petitioner] subsequently drove up and the victim was in the vehicle with him. Johnson testified that the victim got out of the vehicle and the Zervoses and the [petitioner] then drove away at the same time.

Based upon the foregoing testimony, the jury convicted the [petitioner] of two counts of rape of a child and one count of aggravated sexual battery. Following a sentencing hearing, the trial court sentenced the [petitioner] to an effective sentence of twenty-one years incarceration.

*Johnson*, 2003 WL 22999449, at *1-*5 (footnote omitted).

## III. **Discussion**

The instant petition for habeas corpus raises nine grounds:[1] (1) insufficient evidence; 2) jury and jury venire age-based discrimination; (3) evidentiary ruling (excited utterance); (4) ineffective assistance of counsel for failing to request and raise on appeal a jury instruction (child abuse); (5) to challenge a juror; (6) to challenge a jury instruction (credibility); (7) to object and raise on appeal prosecutorial misconduct (comments); (8) the state courts failed to use an objective standard of reasonableness in evaluating the ineffective assistance claims; and (9) prosecutorial misconduct (false testimony and non-disclosure of evidence).

The Warden suggests, in his response, that relief should not be granted because claims 3, 8-9 have been procedurally defaulted (and that claim 8 also has been insufficiently pled) and because Johnson is not entitled to relief from the state court decisions rejecting the remaining claims on the merits (i.e., claims 1-2, 4-7), given the deferential standards of review set forth in 28 U.S.C. § 2254. The Court agrees with respondent Warden and, for the reasons which follow, will **DENY** the petition and **DISMISS** this case.

These claims have been organized into two categories for purposes of discussion. The first category encompasses the procedurally defaulted (and insufficiently pled) claims. The second category contains those claims which were adjudicated in the Tennessee courts.

---

[1] The Warden, in his response, renumbered Johnson's claims as numbers 1-10. However, since the grounds for relief were numbered 1-9 in Johnson's § 2254 petition, the Court will follow suit.

A. **Procedurally Defaulted Claims**

A state prisoner who petitions for habeas corpus relief must first exhaust his available state court remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. 28 U.S.C. § 2254(b) (1). The exhaustion rule requires total exhaustion of state remedies, *Rose v. Lundy*, 455 U.S. 509 (1982) (emphasis added), meaning that a petitioner must have fairly presented each claim to all levels of appropriate state courts. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845-47 (1999). A claim must also be offered on a federal constitutional basis—not merely as one arising under state law. *Stanford v. Parker*, 266 F.3d 442, 451 (6th Cir. 2001) (citing *Riggins v. McMackin*, 935 F.2d 790, 792-93 (6th Cir. 1991)).

A prisoner who has failed to present a federal claim to the state courts and who is now barred by a state procedural rule from returning with his claim to those courts has committed a procedural default. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Federal review of a procedurally defaulted claim is foreclosed, unless the habeas petitioner can show cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation. *Id.* Cause can be shown where interference by state officials has rendered compliance with the rule impracticable, where counsel rendered ineffective assistance in violation of the prisoner's right under the Sixth Amendment, or where the legal or factual basis of a claim is not reasonably available at the time of the procedural default. *Murray v. Carrier*, 477 U.S. 478, 488, 492 (1986). A petitioner demonstrates prejudice by establishing that the constitutional error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Johnson alleges, as claim 3, that the trial court's refusal to admit as substantive evidence the victim's father's statement (i.e., that the same thing had happened to his son in Ohio) violated petitioner's right to due process. Even though the statement was allowed as a prior inconsistent statement for purposes of impeachment, had it also been admitted as an excited utterance to be used as substantive evidence, petitioner argues that he could have established that sexual penetration of the victim had been caused by someone else.

In claim 8, Johnson maintains that the state courts failed to utilize the objective standard of reasonableness set forth in *Strickland*, in considering his claims that he received ineffective assistance from his attorneys. More specifically, Johnson suggests that the state courts employed his possible acquiescence in making the determination that counsel was effective.

Petitioner asserts, in claim 9, that, in violation of due process, the prosecution knowingly presented false testimony and knowingly withheld exculpatory evidence concerning compensation received by the victim and his family.

The Warden, in his answer, argues that Johnson has committed a procedural default of claim 3 by failing to offer the claim to state courts as a constitutional violation; of claim 8 by offering in only to the state supreme court and not first to the TCCA; and of claim 9 by presenting it in his post-conviction petition, but failing to carry it to any state appellate court.

The Court has examined Johnson's briefs on direct appeal and post-conviction appeal and finds that, while he raised the admission of the victim's father's statement as an issue, he did so solely based on state evidentiary rules and not on federal constitutional law, [Doc. 11, Addendum 2, Doc. 1 at 24-27, Doc. 5 at 13-15]. This constitutes a state

procedural default. Johnson's contentions, as contained in claim 8, that his ineffective assistance claims were not reviewed under the standard of objective reasonableness by the state courts was presented in his petition for permission to appeal to the state supreme court, [Doc. 11, Addendum 4, Doc. 4 at 3, 27-28], but were not first offered in his brief to the TCCA. This likewise amounts to a procedural default.

Moreover, the allegations of prosecutorial misconduct which are asserted as due process violations in claim 9 in Johnson's § 2254 petition were presented during the state post-conviction proceedings as illustrations of ineffective assistance, in violation of the right to counsel in the Sixth Amendment, [Doc. 11, Addendum 4, Doc. 1 at 6; Doc. 4 at 4-5, 45-48]. Maintaining that counsel has failed to investigate or object to instances of prosecutorial misconduct under the Sixth Amendment is not the equivalent of challenging comments or conduct of the prosecutor under the Due Process Clause of the Fourteenth Amendment. Thus, because the prosecutorial misconduct claim offered in the § 2254 petition was not offered first to the state courts, it too has been procedurally defaulted.

Petitioner can still obtain habeas review of those claims if he can demonstrate cause and also prejudice. Johnson has not shown, or even alleged, cause and prejudice to surmount the default, and he, thereby, has forfeited federal habeas corpus review of these claims.

## B.  Adjudicated Claims

Under the review standards set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA), codified in 28 U.S.C. § 2241, *et seq.*, a court considering a habeas claim must defer to any decision by a state court concerning the claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(1)-(2).

A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or resolves a case differently on a set of facts which cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the "unreasonable application" prong of § 2254(d)(1), the relevant inquiry is whether the state court decision identifies the legal rule in Supreme Court cases which governs the issue but unreasonably applies the principle to the particular facts of the case. *Id.* at 407. The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Id.* at 411.

This is a high standard to satisfy. *Bowen v. Jones*, 2012 WL 573863, *5 (6th Cir. Feb. 22, 2012) (observing that to prevail on a state-court adjudicated claim, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement") (citing *Harrington v. Richter*, 131 S.Ct. 770, 786-87 (2011)). Further, findings of fact which are sustained by the record are entitled to a presumption of correctness—a presumption which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

1. _Insufficient Evidence (Pet., Claim 1)_

In his first claim in the adjudicated-claims category, petitioner maintains that the evidence presented in the state court was insufficient as a matter of law to support the convictions of rape of a child and aggravated sexual battery and that his convictions violate his Fourteenth Amendment right to due process of law. More specifically, he complains that, given the inconsistencies between the testimonies of Nurse Spada, Dr. Tiger, and the victim, along with inconsistencies involving the relevant dates of the alleged criminal conduct, it would have been impossible for the sexual offenses for which he was charged to have occurred. Johnson concludes that the lack of sufficient proof means that the jury was allowed "to speculate [him] into prison," [Doc. 1, Pet. at 5].

Respondent argues that the claim was adjudicated in the TCCA and resulted in a finding that the evidence was legally sufficient to support Johnson's convictions—a ruling which is not contrary to or an unreasonable application of the clearly established Supreme Court precedent, nor based on an unreasonable determination of the facts presented to the state courts.

In the TCCA, Johnson focused his insufficient-evidence attack on "the conflicts in the testimonies of Spada and Dr. Tiger regarding the injuries to the victim, and the inconsistencies in the victim's testimony at trial and his statements to Raulston and Dr. Tiger."[2]  _Johnson_, 2003 WL 22999449, at *10.  Petitioner specifically challenged his conviction for the December 11, 1998, child rape offense based on Dr. Tiger's testimony

---

[2] Vanessa Raulston, who testified for both the prosecution and the defense, was the case manager with the Department of Children's Services who had conducted three interviews with the victim regarding the alleged incidents of sexual abuse." _Johnson_, 2003 WL 22999449, at *4.

that "during his examination of the victim on December 13, 1998, he found no indication of sexual abuse within the 'two days prior to [the] exam,' and the victim told him that the last incident of abuse occurred 'more than a week before.'" *Id*.

In addressing this claim, the TCCA examined the evidence against petitioner and did so in the context of the elements of the offense. The TCCA noted that child rape, under Tennessee law, *see* Tenn. Code Ann. § 37-1-612(a) (1997), is defined as "the unlawful sexual penetration of a victim by the defendant ..., if such victim is less than thirteen (13) years of age." Sexual penetration means "sexual intercourse ... or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's ... body." *See* Tenn. Code Ann. § 39-13-501(7) (1997).

An aggravated sexual battery occurs when a defendant engages in unlawful sexual contact with a victim who is less than thirteen years old. *See* Tenn. Code Ann. § 39-13-504(a)(4) (1997). "Sexual contact" is the "intentional touching of the victim's ... intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's ... intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification," *see* Tenn. Code Ann. § 39-13-501(6), with "intimate parts" being defined as "the primary genital area, groin, inner thigh, buttock or breast of a human being." *See* Tenn.Code Ann. § 39-13-501(2).

In assessing this claim, the state court initially pointed to the evidence adduced at trial. That proof included testimony by the victim that in November of 1998, Johnson and he were in Johnson's living room when Johnson touched the victim's "private parts" through his clothes and that, on December 1, 1998, and December 11, 1998, petitioner took the victim into the bedroom, told him to bend over and pull down his pants, and, using "a white

14

bottle of lotion," inserted his "front private" into the victim's "rear private." Testimony by the victim and his father established that, at the time of trial, the victim was eleven years of age. The TCCA also pointed to trial testimony that the victim circled the penis on the drawing of a body when asked by the DCS case manager to circle the part of the body which was inappropriately touched by Johnson. Further testimony established that, during interviews with the DCS employee, the victim alleged two episodes of anal penetration—on December 1st and 11th of 1998.

Also offered was testimony by a nurse that, upon her examination of the victim following his report of child abuse, she observed that he had lost muscle tone in the anus and that his anal folds had flattened—a condition which she described as consistent with the victim's contentions of anal penetration and with an "outside force" being applied a couple of times. An emergency room resident physician testified to finding two bruises around the victim's anus, which were consistent with penetration, when he examined the victim on December 13, 1998, though he stated that he did not observe any flattening of the anal folds.

Rejecting petitioner's argument that the evidence was insufficient due to conflicts between the testimonies of the nurse and the resident physician and to inconsistencies between the victim's testimony and his statements to other witnesses, the TCCA found that credibility and weight-of-the-evidence questions were within the jury's purview and that Johnson's claim lacked merit.

The standard which controls this type of claim is found in *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). There, the Supreme Court held that sufficient evidence supports a conviction if, after viewing the evidence and the inferences to be drawn therefrom in light

most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 324. It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Petitioner "bears a heavy burden" when insufficiency of the evidence is claimed. *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir.1986).

The TCCA conducted its review based on the standard for evidentiary sufficiency established in *Jackson* and it also cited to *Jackson* in its discussion. The test for a claim of insufficient evidence is, as the state court recognized, that enunciated in *Jackson*. *See Gall v. Parker*, 231 F.3rd 265, 287-88 (6th Cir. 2000). Because the state court, in analyzing the insufficient-evidence claim, applied the principles in *Jackson*—the relevant Supreme Court precedent, this Court can only grant relief if petitioner demonstrates that the application itself was unreasonable or that the decision was based on an unreasonable factual determination.

Johnson has not met this obligation and, thus, he is not entitled to a writ of habeas corpus on this issue.

2. *Age-Based Discrimination (Jury Venire and Petite Jury) (Pet., Ground 2)*

In this claim, petitioner asserts that the names of persons who were sixty-five years of age or older were removed from the jury venire and that this constituted purposeful discrimination, deprived him of a jury composed of a fair cross section of the community, and denied him equal protection under the law.

When Johnson presented this claim to the TCCA, the state appellate court, citing to various state court cases, one of which in turn cited to *Castaneda v. Partida*, 430 U.S.

482, 494 97 S.Ct. 1272, 1280, 51 L.Ed.2d 494 (1977), iterated the test for establishing a prima facie case of purposeful discrimination in grand jury selection. That test comprised three prongs: (1) the excluded group must be a recognizable, distinct class capable of being singled out for different treatment under the laws; (2) the selection procedure used by the State to select grand jurors is subject to abuse or is not racially neutral; and (3) the distinct class has been under represented on venires for a significant period of time. The TCAA ruled that petitioner stumbled on the first prong because persons sixty-five years of age and older did not constitute a distinct and cognizable group and that he had failed to show a prima facie case of purposeful discrimination.

Next, the TCCA cited to *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), which enunciated the test to be used to decide whether a jury was properly selected from a fair coss-section of the community, *see Berghuis v. Smith*, 559 U.S. 314, ___,130 S.Ct. 1382, 1392 (2010) (referring to "this Court's pathmarking decision in *Duren*")—a right conferred by the Sixth Amendment. *See Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 697 (1975) ("[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial.").

This test likewise contains three components, namely that the excluded group is a "distinctive" group in the community; that in relation to the number of such persons in the community, the representation of this group in venires from which juries are selected is not fair and reasonable; and the under representation of the group is attributed to systematic exclusion of the group in the jury selection process. *Id.* at 363. The TCCA, referring to its own cases, noted both its unwillingness in the past to find that persons of the age of 65

17

were a "cognizable element of society" and its rhetorical question: "[W]hy would a juror

sixty-three (63) years of age not represent the same interests, as say, a juror sixty-six (66)

years old." The TCCA went on to conclude that Johnson had failed to establish a prima

facie violation of his fair-cross-section right.

Under 28 U.S.C. § 2254(d), '[w]hen assessing whether a state court's application

of federal law is unreasonable, the range of reasonable judgment can depend in part on

the nature of the relevant rule that the state court must apply." *Renico v. Lett*, 130 S.Ct.

1855, 1864 (2010) (citation and internal quotation marks omitted). The Supreme Court has

cautioned "that "[t]he fair-cross-section principle must have much leeway in application."

*Berghuis*, 130 S.Ct. at, 1389 (citing *Taylor*, 419 U.S., at 537-38)). In recognition of the

"leeway [state] courts have in reaching outcomes in case-by-case determinations," when

applying general legal rules, *Yarborough v.  Alvarado*, 541 U.S. 652, 664 (2004), such as

*Castaneda* and *Duren* tests, *see United States v.  Snarr*, 704 F.3d 368, 385, n.5 (5th Cir.

2013) (noting the similarity of the two analyses), this Court finds that the TCCA's rejection

of Johnson's claim was neither an unreasonable application of *Castaneda* or *Duren* nor

based on an unreasonable determination of the facts presented to the state courts.[3]  No

writ will issue.

---

[3]    While the Court recognizes that only Supreme Court decisions count when
determining whether a state-court adjudication of a claim constitutes an unreasonable
application of the Supreme Court precedent, it is worth noting that the Sixth Circuit has ruled
that citizens of over 70 years old did not represent "distinct communities of interests." *United
States v. Booker*, 367 Fed.Appx. 571, 575, 2007 WL 2492427, *3 (6th Cir. Sept. 5, 2007).

3. _Ineffective Assistance of Counsel (Pet., Claims 4-7)_

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI.  A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel.  _Strickland v. Washington_, 466 U.S. 668, 687 (1984).  In _Strickland_, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

_Strickland_ 466 U.S. at 687.  Petitioner has the burden of showing both deficient performance and prejudice, _Smith v. Robbins_, 528 U.S. 259, 285-86 (2000)—the latter burden being quite a heavy one.  _Williams v. Taylor_, 529 U.S. 362, 394 (2000) .

In considering the first prong of the test set forth in _Strickland_, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." _Strickland_, 466 U.S. at 688.  A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." _Id._ at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at

the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires the petitioner to show that counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. In order to prevail on a claim of prejudice, a petitioner must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. While both prongs must be established in order to meet a petitioner's burden, *Strickland* teaches that if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697. Review of a *Strickland* claim under § 2254(d)(1) is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S.Ct. 1411, 1420 (2009). And "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable," but instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. __, 131 S.Ct. at 788 (2011).

Here, Johnson alleges that he received ineffective assistance from his retained attorneys, Lead Counsel M. Keith Davis and Co-Counsels L. Thomas Austin and Jennifer Austin Mitchell. More specifically, petitioner asserts that his lawyers failed to request and raise on appeal a jury instruction concerning a lesser included offense; to challenge a juror for bias; to challenge an improper jury instruction; and to object to and raise on appeal several instances of prosecutorial misconduct.

*a. Lesser Included Offense Instruction*

Petitioner makes the assertions which follow in support of this claim. Under Tennessee law, misdemeanor child abuse has been designated a lesser offense to rape of a child, when a child is treated in any way that results in injury. When such issues are raised, the trial court is required automatically to instruct the jury on the lesser offense. In Johnson's case, there was such an injury. Injury is an element in misdemeanor child abuse, but not in rape of a child. Because of this, a jury who was given the instruction likely would have found petitioner guilty only of the misdemeanor. Counsel failed to request the instruction and raise the trial court's error in failing to give such an instruction in a motion for a new trial or on direct appeal.

This claim of ineffective assistance was entertained by the post-conviction court, which found that, while counsel failed to request a lesser included offense charge of child abuse, any such failing was harmless and resulted in no prejudice to petitioner, [Addendum 3, vol. 1, Findings of Fact and Conclusions of Law and Order at 65-69]. In so deciding, the state trial court relied on state court cases for the rule that a failure to give a lesser-included offense instruction is harmless error where the jury convicts of a greater offense, so long as it was also charged as to an offense which is lower than the convicted offense, but higher than the uninstructed offense, [*Id*. at 67]. The state court reasoned that Johnson had been convicted of the child rape offenses for which he was indicted and that the jury was instructed on the lesser included offense of attempted child rape,[4] but had

_____

[4] Criminal attempt is one step down from the most serious charged offense. *See* Tenn. Code Ann. § 39-12-107(a) (Criminal attempt is punished one offense classification lower than the most serious crime attempted.).

rejected the lesser included offense in reaching its verdict. The post-conviction court then determined that the failure to instruct on child abuse was harmless and did not affect the outcome of the trial and, ultimately, that petitioner was not entitled to relief on his claim of ineffective assistance of counsel, [*Id*. at 66-68].

The TCCA reviewed the post-conviction record and agreed that "any admitted shortcomings regarding request for jury instructions . . . did not result in prejudice to the Petitioner." *Johnson*, 2009 WL 4723382, *3.

At the outset, "the Supreme Court has never held that due process requires the giving of jury instructions on lesser-included offenses in noncapital cases." *Dansby v. Trombley*, 369 Fed. Appx. 657, 659, 2010 WL 891317, *2 (6th Cir. 2010); *see also Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002) (observing that, while the Supreme Court has held that capital case juries must be instructed on lesser included offenses, "it has not so held in noncapital cases"). Thus, since the error found by the state court was not a constitutional error, but instead a state law error, this Court has no warrant to determine whether it "had substantial an injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *see also Douglas v. City of Jeannette (Pennsylvania)*, 319 U.S. 157, 163-164 (1943) (As to "state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted.").

Because federal habeas corpus relief does not lie for errors of state law, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991), the only question for this Court is whether the state court unreasonably applied *Strickland* in concluding that petitioner's ineffective assistance claim lacked merit because he was not prejudiced as a result of counsel's shortcoming.

Johnson must therefore show that there is a reasonable probability that he would have been found guilty of child abuse, or a lesser offense than child rape, had counsel requested the child abuse instruction. He has not done so.

Johnson's jury was instructed on the elements of rape of a child, of attempt to commit rape of a child, of aggravated sexual battery, and of attempt to commit aggravated sexual battery, and assault, [Addendum 1, vol. 8 at 328-31]. The jury was instructed on how to proceed with deliberations, as well. The jury was told that it had to first consider the child rape offense and that, only if it found the petitioner not guilty of child rape, could it consider his guilt of attempt to commit rape of a child, [*Id*. at 332]. It was also told that only if it found the petitioner not guilty of attempted child rape could it proceed to consider the next lesser included offense of aggravated sexual battery, [*Id*.]. And, only if it found him not guilty of aggravated sexual battery, could it consider the next lesser included offense of attempt to commit aggravated sexual battery, [*Id*. at 332-33]. And, it was told the same thing with respect to the next lesser included offense of assault, [*Id*. at 333]. The verdict forms on the two child rape counts reflected that same sequence of offenses, [Addendum 1, vol. 2, Ex. 7, 9].

Juries are presumed to follow their instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Therefore, because the jury rejected the immediate lesser included offense of attempt to commit child rape; likewise rejected the next lesser included offense (aggravated sexual battery) and the lesser included offense which followed (attempt to commit aggravated sexual battery), it would not ever have reached, much less considered, a child abuse instruction—the next lesser included offense, had it been given. *See Weese*

*v. Turner*, 1999 WL 427151, *3-4 (6th Cir. June 15, 1999) ("There is no indication that the jury failed to follow the trial court's correct oral instructions given to it that, if it could not agree about aggravated burglary, it was to move on to the lesser included offense.").

The Court sees no reasonable probability that, but for counsel's failure to request an instruction on the lesser included offense of child abuse, the jury's verdict of guilty for two counts of rape of child would have been different. Thus, the post-conviction court reasonably could have determined that, even if the jury had received instructions on the offense of child abuse, the outcome would have been unaffected.

And given the very onerous standard Johnson must meet to prevail on his ineffective assistance claim, it was not objectively unreasonable, under the *Strickland* test, for the TCCA to conclude that "any admitted shortcomings regarding request for jury instructions . . . did not result in prejudice to the Petitioner" and that his claim lacked merit. *See Strickland*, 466 U.S. at 690, 694 (prejudice established by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different"); *McAuliffe v. United States*, 2013 WL 452421, *4 (6th Cir. Feb. 7, 2013) ("The likelihood of a different result must be substantial, not just conceivable.") (quoting *Harrington v. Richter*, 131 S.Ct. 770, 792 (2011); *Tibbetts v. Bradshaw*, 633 F.3d 436, 442 (6th Cir. 2011) (noting that habeas corpus review must utilize both the *Strickland* and § 2244(d) standards, the latter of which "sets forth a heavy burden for a petitioner to overcome").

*b. Challenge a Juror*

Johnson maintains that his attorneys failed properly to challenge and have removed juror Michael Smith who was related to Ricky Smith—a member of the prosecution's team who sat at the prosecution's table during voir dire. More specifically, petitioner asserts that counsel failed to interview the juror separately as to his relationship with his relative and as to where he stood with respect to the relative's credibility. Further, given that this juror had sat on another child molestation case which ended in a guilty verdict, it was necessary for counsel to have asked Juror Smith whether his relative was also a part of the prosecution team in that case. Absent such questioning, it was impossible to ascertain the level of influence that Juror Smith had over jury deliberations and over the verdict in petitioner's case. The likelihood of potential and significant prejudice could have been remedied had petitioner's attorneys merely made the appropriate inquiries and, in the exercise of great caution, had the juror removed from petitioner's case.

The post-conviction court, when offered this claim of ineffective assistance, noted that while Juror Smith was not asked if he was related to Ricky Smith, a law enforcement officer who was seated at the State's table, counsel testified at the evidentiary hearing that Juror Smith also knew petitioner and his family and that he left this juror on the panel because he was concerned about upcoming jurors, [Addendum 3, vol. 1, Findings of Fact and Conclusions of Law and Order at 66]. The post-conviction court found that petitioner had adduced no proof of prejudice or evidence that Juror Smith was related to Officer Smith and it ultimately denied relief, after concluding that counsel had provided Johnson with "a thorough and competent defense," [*Id*. at 66, 68].

When this issue was carried to the TCCA on appeal, it pointed out that the lower state court had found that Johnson "had failed to establish how he was prejudiced by the juror's presence on the jury;" that the appellate court's own review of the record disclosed "that trial counsel were diligent in their efforts to . . . conduct the trial;" and that Johnson "did not present the testimony of the alleged improper juror or Officer Smith to establish the nature of their familial relationship." *Johnson*, 2009 WL 4723382, at *3. It affirmed the lower state court's determination that counsel had not given petitioner ineffective assistance in this instance.

Since these state-court factfindings have record support and since there is no clear and convincing contravening evidence, this Court defers to those findings (i.e., the determinations of the trial court, as adopted by the state appellate court, that petitioner failed to present evidence to show "how he was prejudiced by the juror's presence on the jury," *Johnson*, 2009 WL 4723382, at *3, so as to sustain his post-conviction claim of ineffective assistance). *See* 28 U.S.C. § 2254(e)(1).

Affording the presumption of correctness to the state court's finding of "no proof of prejudice" necessarily results in the conclusion that, without evidence to show that prejudice ensued from the alleged deficiency, petitioner cannot prevail on this claim of attorney error. It, therefore, follows that the state court's rejection of the claim was not based on an unreasonable determination of the facts presented or an unreasonable application of *Strickland*. *See Strickland*, 466 U.S. at 697 (Where"it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."). The writ will not issue with respect to this claim.

*c. Improper Jury Instruction*

Johnson asserts that his key witness, Robert Vandergriff, testified that the father of the victim, upon learning of the allegations that his son had been sexually assaulted by petitioner, called him (Mr. Vandergriff) and disclosed that the victim had been raped previously in Ohio. By offering this testimony, Johnson hoped to establish that the injuries to the victim could have come from the earlier rape or from some other act at some other time and also that the victim's family had made this same type of allegations in the past. However, immediately following this testimony, the trial court issued an instruction on credibility and, by so doing, denied the defense this proof and, thereby, the fair trial which is guaranteed under the Due Process Clause. His lawyers' failure to object to the instruction or to present it as an issue on appeal, according to Johnson, constituted ineffective assistance.

The post-conviction court entertained this claim, finding succinctly that the allegation lacked merit, "as the proof was overwhelming," [Addendum 3, vol. 1, Findings of Fact and Conclusions of Law and Order at 68]. The TCCA did not engage in any extended discussion when the issue was presented on post-conviction appeal, but recounted that the lower court had found that Johnson had not established any prejudice from "counsel's alleged failures in objections . . . during the trial, given the overwhelming proof of guilt," before deciding that petitioner had failed "to meet his burden of proof regarding his allegations of ineffective assistance of counsel." *Johnson*, 2009 WL 4723382, at *3.

At the conclusion of Mr. Vandergriff's testimony, the trial court gave the instruction upon which is bottomed petitioner's claim of ineffective assistance:

Ladies and gentlemen, let me give you some information that you need in assessing testimony. One of your jobs in this trial is to assess the credibility of the witnesses that testify. One of the factors that you can use in evaluating a witness' (sic) testimony is whether the witness had made material statements at some point before he testified which differ from the witness' (sic) testimony at trial, proof of any prior different statement may be considered by you only for the purpose of determining whether the witness is telling the truth at trial. The contents of the prior inconsistent statement are not considered as proof at the trial . . . .

[Addendum 1, vol. 7, T. Tr. at 272].

During the evidentiary hearing in the post-conviction court, when trial counsel was questioned as to his reason for not objecting to the instruction, he testified that he did not object because he "thought it was a proper instruction," [Addendum 3, vol. 2, Evid. H'rg. Tr. at 12-13].

Though petitioner has not directed the Court's attention to any Supreme Court case which teaches that such an instruction violates due process of law, the Court will assume, for the purpose of resolving this claim, that the instruction was improper, as alleged by petitioner. Even so, absent a showing as to how the instruction prejudiced Johnson's defense at trial, petitioner has not established a claim for ineffective assistance. *Strickland*, 466 U.S. at 697 (both "deficient performance" and "prejudice" prongs of test must be shown, but a failure to show sufficient prejudice dooms the claim). Therefore, the Tennessee court's rejection of his claim was neither contrary to nor an unreasonable application of clearly established Federal law. Habeas relief is not warranted with respect to this claim.

*d. Prosecutorial Misconduct*

In the last instance of alleged ineffective assistance, Johnson contends that his attorneys were silent in the face of several instances of prosecutorial misconduct. The prosecutor's conduct which should have been challenged, so alleges Johnson, consisted of religious references, statements that petitioner was guilty, personal opinions that the State had proved its case, improper vouching, and personal attacks on the defense counsel. Yet, counsel failed to object to any of these comments or to raise them as issues in a motion for a new trial or on direct appeal and, thereby, rendered to petitioner ineffective assistance.

During the evidentiary hearing, counsel was asked, during his direct testimony, why he did not object to three remarks made during the prosecutor's closing argument. Those comments were: (1) "You all heard Vanessa Ralston testify. Did she come across as a pushy person who would put words in [the victim's] mouth? I don't think so"; (2) "The judge is going to instruct you on the credibility of witnesses and think about Mr. Vandergriff late yesterday afternoon what you're going to take his testimony for. First of all you have to weigh his credibility, which I submit to you is about rock bottom"; and (3), "Well he [Mr. Johnson] lied, ladies and gentlemen," [Addendum 3, vol. 2, Evid. H'rg. Tr. at 20-21]. Counsel explained that he did not object to the remarks because, in the context in which they were made, they were arguments and, by implication, they were proper arguments, [*Id*.]. The trial court did not grant relief, based on petitioner's failure to establish any prejudice from the lack of objections to those comments and the strength of the proof of guilt adduced against him.

In petitioner's brief on post-conviction appeal to the TCCA, he claimed that "no objections were made when the prosecution stated their (sic) opinion during closing argument," but did not offer any specific factual allegations as to the content of the challenged statements of opinion, [Addendum 4, Pet'r Post-Conviction Brf., Doc. 1 at 6-7]. In addressing the issue, the TCCA first observed that the post-conviction court had determined that, in view of the overwhelming proof of guilt presented, counsel's alleged failure to object did not result in prejudice. *Johnson v. State*, 2009 WL 4723382, at *3. The TCCA, in "agree[ment] with the post-conviction court that the Petitioner has failed to meet his burden of proof regarding his allegations of ineffective assistance of counsel," then affirmed the lower court's decision denying collateral relief.

In *Darden v. Wainwright,* 477 U.S. 168 (1986), a prosecutor's improper remarks were held to violate the Constitution only where they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)). The *Darden* prosecutor's closing argument, according to the Supreme Court,

> "deserves the condemnation it has received from every court to review it, although no court has held that the argument rendered the trial unfair. Several comments attempted to place some of the blame for the crime on the Division of Corrections, because Darden was on weekend furlough from a prison sentence when the crime occurred. Some comments implied that the death penalty would be the only guarantee against a future similar act. Others incorporated the defense's use of the word 'animal.' Prosecutor McDaniel made several offensive comments reflecting an emotional reaction to the case. These comments undoubtedly were improper. But as both the District Court and the original panel of the Court of Appeals (whose opinion on this issue still stands) recognized, it 'is not enough that the prosecutors' remarks were undesirable or even

universally condemned.' The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'"

*Id.*, at 179-181.  The Supreme Court did not find that the remarks caused the petitioner in *Darden* to be denied a fair trial or due process and declined to grant habeas corpus relief.

Overlooking the lack of any developed argument to support the habeas claim in this Court or the post-conviction claim in the TCCA, it remains that petitioner has not shown how the prosecutor's cited comments, which were discussed during the post-conviction hearing, "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Given that the prosecutor's remarks in Johnson's case were nowhere near as condemnable as those highlighted in *Darden*, they could not have resulted in an unfair trial so as to cause him a denial of due process by virtue of his convictions.  If the prosecutorial misconduct which petitioner alleges his attorneys should have challenged did not deny him a fair trial, then, just as the state courts determined, petitioner has suffered no prejudice from counsel's failure to object to that supposed misconduct.

Given that the AEDPA "demands that state-court decisions be given the benefit of the doubt," *Renico*, 599 U.S. at, __, 130 S. Ct.  at 1862 (citations omitted), and in view of the onerous standard which must be met to prevail on an ineffective assistance claim under the AEDPA, see *Harrington*, 562 U.S. __, 131 S.Ct. at 788, the Court finds that relief is unwarranted here because the TCCA's rejection of petitioner's claim of ineffective assistance was not an unreasonable application of nor contrary to the pertinent Supreme

Court precedents and because the state court did not unreasonably determine the facts placed before it.

## IV. Certificate of Appealability

Finally, the Court must decide whether to issue a certificate of appealability (COA). A petitioner qualifies for issuance of a COA if he has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c). A petitioner, whose claims have been rejected on the merits, satisfies the requirements of § 2253(c) by showing that jurists of reason would find the assessment of the claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). A petitioner, whose claims have been rejected on a procedural basis, must demonstrate that reasonable jurists would debate the correctness of the Court's procedural ruling. *Id.*; *Porterfield v. Bell*, 258 F.3d 484, 485-86 (6th Cir. 2001).

The Court has individually assessed petitioner's claims under the relevant standards and finds that those claims do not deserve to proceed further because they have no viability in light of the governing law. Thus, jurists of reason would not conclude that the disposition of those claims was debatable or wrong. Because Johnson has failed to make a substantial showing of the denial of a constitutional right, a COA will not issue.

A separate order will follow.


**ENTER**:

_____*/s/Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE